ORLANDO L. GARCIA, CHIEF U.S. DISTRICT JUDGE
Pending before the Court is the Motion for Summary Judgment on Plaintiffs' One Person, One Vote Equal Protection Claim, filed by the Edwards Aquifer Authority ("EAA"). Docket no. 119. Intervenor-Defendants Guadalupe-Blanco River Authority, City of Uvalde, County of Uvalde, City of San Marcos, and New Braunfels Utilities have joined in the EAA's motion for summary judgment. Docket nos. 117, 122, 124, 129, and 137. The Texas Farm Bureau and Past and Current Members of the EAA Board of Directors have filed amici briefs in support of the EAA's motion for summary judgment. Docket nos. 166, 182. The LULAC plaintiffs and San Antonio *737 Water System ("SAWS") filed a joint response in opposition to the EAA's motion for summary judgment (docket nos. 140-158) and the EAA filed a reply (docket no. 169). LULAC and SAWS also filed a response to the current and former board members' amicus brief. Docket no. 183.
Also pending before the Court is Plaintiffs' Joint Motion for Partial Summary Judgment on One Person, One Vote Equal Protection Claim. Docket no. 168. The EAA filed a response (docket no. 169) and Intervenor-Defendants Guadalupe-Blanco River Authority, New Braunfels Utilities, City of San Marcos, City of Uvalde, and County of Uvalde joined in the EAA's response (docket nos. 170, 171, 172, 173, 174). Plaintiffs also filed a reply in support of their motion for partial summary judgment. Docket no. 175.
After reviewing the record and the applicable law, the Court finds that the EAA's Motion for Summary Judgment on Plaintiffs' One Person, One Vote Equal Protection Claim (docket no. 119) should be granted and Plaintiffs' Joint Motion for Partial Summary Judgment on One Person, One Vote Equal Protection Claim (docket no. 168) should be denied.
I.
Statement of the case
A. The parties:
This lawsuit was filed by the League of United Latin American Citizens (LULAC), Marie Martinez, Jesse Alaniz, Jr. and Ramiro Nava (collectively "the LULAC plaintiffs") against the Edwards Aquifer Authority in June 2012. See docket no. 1. The City of San Antonio, acting by and through the San Antonio Water System ("SAWS") sought permission to intervene as a plaintiff in August 2012, and permission was granted. Docket nos. 8, 10. The LULAC plaintiffs filed their First Amended Complaint in January 2013 (docket no. 28) and their Second Amended Complaint in March 2013 (docket no. 38). The LULAC plaintiffs added the Secretary of State as a party defendant in their Second Amended Complaint. Docket no. 38. In August 2013, SAWS filed its First Amended Complaint in Intervention, also adding the Secretary of State as a defendant. Docket no. 70. All claims against the Secretary of State were dismissed on March 31, 2014. Docket no. 165. Several other governmental entities have intervened as defendants and are aligned with EAA, including the City of San Marcos, City of Uvalde, County of Uvalde, New Braunfels Utilities and Guadalupe Blanco River Authority. The City of Victoria, Past and Current Individual Members of the EAA Board of Directors, and the Texas Farm Bureau are not parties but they have filed amici briefs.
B. The claims:
The LULAC plaintiffs bring two causes of action challenging the current apportionment plan for the single member districts used to elect directors to the EAA. The first claim is brought under 42 U.S.C. § 1983 for alleged violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; the second claim is brought under 42 U.S.C. § 1973, Section 2 of the Voting Rights Act, for alleged dilution of minority votes. Docket no. 38. Intervenor-Plaintiff SAWS brings only a cause of action under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (the one person, one vote claim). Docket no. 70. Both LULAC and SAWS seek declaratory and injunctive relief and a statutory award of attorneys fees and costs. Docket nos. 38, 70. The parties have agreed to stay LULAC's cause of action under Section 2 of the Voting Rights Act and proceed with LULAC and *738 SAWS' Equal Protection claim. Docket no. 68. The motions for summary judgment address only the Equal Protection claim.
II.
Summary judgment standard
Summary judgment is proper when the evidence shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) ; Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 250-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56"mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party. who fails ... to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Curtis v. Anthony , 710 F.3d 587, 594 (5th Cir. 2013) (quoting Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ).
The Court must draw reasonable inferences and construe evidence in favor of the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Although the evidence is viewed in the light most favorable to the nonmoving party, a nonmovant may not rely on "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence" to create a genuine issue of material fact sufficient to survive summary judgment. Freeman v. Tex. Dep't of Criminal Justice , 369 F.3d 854, 860 (5th Cir. 2004).
III.
The general rule: one person, one vote
In 1963, Justice Douglas, writing for the Supreme Court, stated that "[t]he conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing-one person, one vote." Gray v. Sanders , 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). The justiciability of a claim based on this principle was first recognized in Baker v. Carr , 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The Supreme Court extended the application of the one person, one vote principle to state legislatures in Reynolds v. Sims , 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and local governmental units such as counties and cities in Avery v. Midland County , 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).
In Reynolds v. Sims , the Alabama Legislature had failed to reapportion itself since 1901. 377 U.S. at 540, 84 S.Ct. 1362. After 60 years of population growth, the legislative districts were severely malapportioned. Id. Because the vote of individuals in overpopulated districts carried less weight than the vote of individuals in underpopulated districts, the voters in disfavored areas were being deprived of their right to an equal vote. Id. at 562-568, 84 S.Ct. 1362. The Court found the districting schemes in Alabama to be unconstitutional and held that "[t]he Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races." Id. at 568, 84 S.Ct. 1362. Thus, "the seats in both houses of a bicameral state legislature must be apportioned on a population basis." Id. This means that the State must "make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable." Id. at 577, 84 S.Ct. 1362. The Court stated that "the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State."
*739 Id. at 579, 84 S.Ct. 1362. The Court did note that state legislative districts far outnumber congressional districts so more flexibility is permitted in apportionment of state seats. Id. at 578, 84 S.Ct. 1362. The Court further noted that any deviations in population must be based on clearly rational state policy. Id. at 582, 84 S.Ct. 1362.
Subsequent cases tested the limits of constitutionally permissible population deviations in apportionment plans, and the results differ based on the proffered explanation for the deviation and whether the record supports the explanation. See Connor v. Finch , 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977) (court drawn Senate plan and aspects of the House plan held unconstitutional because the record showed that the state policy of protecting the integrity of political subdivisions and historical boundaries could have been achieved with less deviation); see also Brown v. Thomson , 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (one district with substantial population deviation held constitutional because it was based on Wyoming's long standing, consistently applied, and clearly legitimate state policy of using counties as representative districts).
IV.
The Salyer / Ball exception
While the one person, one vote principle is firmly embedded in American jurisprudence, the Supreme Court had the foresight to realize that exceptions to the rule may arise. In Avery , the Court explained that "[w]ere the Commissioners Court a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents, we would have to confront the question whether such a body may be apportioned in ways which give greater influence to the citizens most affected by the organization's functions." 390 U.S. at 483-484, 88 S.Ct. 1114. Under the facts in Avery , the Court found that the Commissioners Court had "general government powers over the entire geographic area served by the body" and a "substantial variation from equal population" in drawing districts would violate the one person, one vote principle. Id. at 484-85, 88 S.Ct. 1114. However, the Court in Avery left open the question of whether representation in "special purpose" districts could be apportioned based on interest rather than population. Two years later, the Supreme Court in Hadley v. Junior College District , 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), determined that a plan for electing junior college trustees violated the Equal Protection Clause and reiterated that one person, one vote is the general rule but again acknowledged that an exception to the rule may be recognized under a different set of facts:
We therefore hold today that as a general rule, whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials. It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with Reynolds, supra , might not be required, but certainly we see nothing in *740 the present case that indicates that the activities of these trustees fit in that category.
Hadley , 397 U.S. at 56, 90 S.Ct. 791.
Three years later, in Salyer Land Co. v. Tulare Lake Basin Water Storage District , 410 U.S. 719, 720, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973), the Supreme Court was "presented with the issue expressly reserved in Avery. " The Salyer case involved a water storage district that was created by the California Legislature to provide a local response to the problem of inadequate water supplies.[1] The water storage district's purpose, power, and authority was described as follows:
Such districts are authorized to plan projects and execute approved projects for the acquisition, appropriation, diversion, storage, conservation, and distribution of water. Incidental to this general power, districts may acquire, improve, and operate any necessary works for the storage and distribution of water as well as any drainage or reclamation works connected therewith, and the generation and distribution of hydroelectric power may be provided for. They may fix tolls and charges for the use of water and collect them from all persons receiving the benefit of the water or other services in proportion to the services rendered. The costs of the projects are assessed against district land in accordance with the benefits accruing to each tract held in separate ownership.
410 U.S. at 723-24, 93 S.Ct. 1224 (internal citations and quotations omitted). The water storage district was governed by a board of directors elected from the divisions within the district Id. at 724, 93 S.Ct. 1224. The Salyer plaintiffs claimed the qualifications for voting in the elections for directors, which were based on land ownership rather than mere residency, violated their right to equal protection of the laws under the Fourteenth Amendment. After considering the parties' arguments, the Court found that an exception to the general rule was warranted and applied the rational basis test to find the voter qualification scheme constitutional:
We conclude that the appellee water storage district, by reason of its special limited purpose and of the disproportionate effect of its activities on landowners as a group, is the sort of exception to the rule laid down in Reynolds which the quoted language from Hadley, supra , and the decision in Avery, supra , contemplated.
* * *
[We] hold that the voter qualification for water storage district elections was rationally based and did not violate the Equal Protection Clause.
Id. at 728, 734-35, 93 S.Ct. 1224. In its reasoning, the Court focused on the purpose of the water storage district, its power and authority, and the proportionality of the benefits and burdens on the people and the land affected by its operations. The Court explained:
The appellee district in this case, although vested with some typical governmental powers, has relatively limited authority. Its primary purpose, indeed the reason for its existence, is to provide for the acquisition, storage, and distribution of water for farming in the Tulare Lake Basin. It provides no other general public services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body. There are no *741 towns, shops, hospitals, or other facilities designed to improve the quality of life within the district boundaries, and it does not have a fire department, police, buses, or trains. Not only does the district not exercise what might be thought of as "normal governmental" authority, but its actions disproportionately affect landowners. All of the costs of district projects are assessed against land by assessors in proportion to the benefits received. Likewise, charges for services rendered are collectible from persons receiving their benefit in proportion to the services.
Salyer , 410 U.S. at 728-29, 93 S.Ct. 1224. The Court further explained that "it is quite understandable that the statutory framework for election of directors of the [water storage district] focuses on the land benefited, rather than on people as such." Id. at 729-30, 93 S.Ct. 1224. Thus, while members of the general public may be affected, the California Legislature was reasonable to conclude that landowners needed to be the dominant voice in its control. Id. at 730-32, 93 S.Ct. 1224. The Court framed the issue as follows: "in the type of special district we now have before us, the question for our determination is not whether or not we [would have done something differently], but instead whether... 'any state of facts reasonably may be conceived to justify' California's decision...". Id. at 732, 93 S.Ct. 1224 (quoting McGowan v. Maryland , 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) ). The Court in Salyer could not find the property-based voting scheme to be "wholly irrelevant to achievement of the regulation's objectives." Id. at 730, 93 S.Ct. 1224. Thus, the scheme passed the rational basis test and did not violate the Equal Protection Clause. Id. at 735, 93 S.Ct. 1224.
The Supreme Court decided a similar case on the same day it decided the Salyer case. Associated Enterprises, Inc. v. Toltec Watershed Imp. Dist. , 410 U.S. 743, 745, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973). Again, the Court held, based on the reasoning in Salyer , that the watershed district was a governmental unit of special or limited purpose and the voting scheme in question, which entitled only landowners to vote according to acreage, did not violate the Equal Protection Clause. Id.
Several years later, in Ball v. James , 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981), the Supreme Court revisited this issue. The Ball case involved a challenge to the constitutionality of an Arizona statute providing that voting in elections for directors of an agricultural improvement and power district was limited to landowners and their voting power was apportioned based on the number of acres owned. The Court described the special purpose district as follows:
The public entity at issue here is the Salt River Project Agricultural Improvement and Power District, which stores and delivers untreated water to the owners of land comprising 236,000 acres in central Arizona. The District, formed as a governmental entity in 1937, subsidizes its water operations by selling electricity, and has become the supplier of electric power for hundreds of thousands of people in an area including a large part of metropolitan Phoenix. Nevertheless, the history of the District began in the efforts of Arizona farmers in the 19th century to irrigate the arid lands of the Salt River Valley, and, as the parties have stipulated, the primary purposes of the District have always been the storage, delivery, and conservation of water.
* * *
As noted by the Court of Appeals, the services currently provided by the Salt River District are more diverse and affect *742 far more people than those of the Tulare Lake Basin Water Storage District. Whereas the Tulare District included an area entirely devoted to agriculture and populated by only 77 persons, the Salt River District includes almost half the population of the State, including large parts of Phoenix and other cities. Moreover, the Salt River District, unlike the Tulare District, has exercised its statutory power to generate and sell electric power, and has become one of the largest suppliers of such power in the State. Further, whereas all the water delivered by the Tulare District went for agriculture, roughly 40% of the water delivered by the Salt River District goes to urban areas or is used for nonagricultural purposes in farming areas. Finally whereas all operating costs of the Tulare District were born by the voting landowners through assessments apportioned according to land value, most of the capital and operating costs of the Salt River District have been met through the revenues generated by the selling of electric power.
Ball , 451 U.S. at 357, 366, 101 S.Ct. 1811. "Nevertheless, a careful examination of the Salt River District reveal[ed] that, under the principles of the Avery, Hadley , and Salyer cases, these distinctions d[id] not amount to a constitutional difference." Id. at 366, 101 S.Ct. 1811. First, the Salt River District "did not exercise the sort of governmental powers that invoke the strict demands of Reynolds. " Id. Although the District could raise money through an acreage-proportionate taxing power or through bonds, it could not impose ad valorem property taxes or sales tax. Id. at 360, 366, 101 S.Ct. 1811. It could not "enact any laws governing the conduct of citizens, nor [did] it administer such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services." Id. at 366, 101 S.Ct. 1811. Second, the District's water functions, which were the primary and originating purpose of the District, were relatively narrow. The District did not own, sell, or buy water, or control the use of the water they delivered. The District stored the water behind its dams, conserved it from loss, and delivered it through project canals. Although as much as 40% of the water went to nonagricultural purposes, the Court found that "the distinction between agricultural and urban land is of no special constitutional significance in this context." Id. at 367, 101 S.Ct. 1811. And finally, "neither the existence nor size of the District's [hydroelectric] power business affect[ed] the legality of its property-based voting scheme." Id. at 368, 101 S.Ct. 1811. The ability to generate and sell electricity did not change the character of the District. The storage, conservation, and delivery of water was still the primary purpose of the District. Id. at 368-69, 101 S.Ct. 1811. The Supreme Court found that the purpose, authority, and functions of the Salt River District justified a departure from the strict demands of the one person, one vote principle. Ball , 451 U.S. at 370, 101 S.Ct. 1811. The voting scheme was reasonably related to the statutory objectives for the District and Arizona had a rational basis for limiting the persons eligible to vote and weighing their votes differently. Id. at 371, 101 S.Ct. 1811.
The California Supreme Court, sitting en banc , applied the Salyer / Ball exception in determining the constitutionality of the property-based voting scheme for the Southern California Rapid Transit District. Southern Calif Rapid Transit Dist. v. Bolen , 822 P.2d 875, 1 Cal. 4th 654 (1992). The Court in Bolen thoroughly analyzed the Salyer / Ball exception and observed:
*743 No one reviewing this area of the high court's equal protection jurisprudence can fail to be impressed with the result in Ball -not because the opinion represents an analytical advance over the principles developed in Salyer , but because it illustrates the majority's steadfast willingness to adhere to the Salyer analysis in the face of a record presenting such compelling, if "constitutionally irrelevant," facts. Clearly, in light of Ball , as far as the governmental function analysis is concerned, the constitutionally decisive fact is that the voting scheme at issue reflects the "narrow primary purpose for which the [public entity] is created."
Bolen , 1 Cal. 4th at 668-69, 3 Cal.Rptr.2d 843, 822 P.2d 875 (quoting Ball , 451 U.S. at 369, 101 S.Ct. 1811 ).
There have been cases since Salyer and Ball with facts that did not fit within the exception, but federal courts are well aware of the exception and its application when circumstances warrant. See, e.g., Rice v. Cayetano , 528 U.S. 495, 522, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (Supreme Court found that the Salyer / Ball exception did not apply to statewide elections for the Office of Hawaiian Affairs, which limited voters to native Hawaiians; rather, the Fifteenth Amendment controlled); Kessler v. Grand Central Dist. Mgmt. Ass'n, Inc. , 158 F.3d 92, 108 (2nd Cir 1998) (Second Circuit found the Salyer / Ball exception applied to the Grand Central Business District's weighted voting scheme which guaranteed majority Board representation to property owners); Hellebust v. Brownback , 824 F.Supp. 1506, 1510 (D. Kan. 1993) ( Salyer / Ball exception did not apply because the State Board of Agriculture's general governmental power to regulate for the benefit of the health, safety, and welfare of all Kansas residents made it subject to the general rule in Reynolds ), aff'd , 42 F.3d 1331 (10th Cir. 1994).
V.
The applicable standard
The threshold question is whether the strict demands of the one person one vote principle under Reynolds must be applied or a more relaxed rational basis review under the Salyer / Ball exception is appropriate.[2] If the one person one vote principle is applied, the EAA has a substantial burden of demonstrating a compelling justification for its apportionment scheme. If this case qualifies for an exception to the Reynolds principle, the constitutional test is less demanding and the Court must simply determine whether the apportionment scheme is rationally related to the statutory objectives of the EAA.[3] The Court begins by looking at the creation, purpose, power, and authority of the EAA.
A. Creation of the EAA
Severe droughts in the early 1900's prompted Texas citizens to approve the *744 Conservation Amendment to the Texas Constitution, which calls for the conservation and preservation of all natural resources of the State. TEX. CONST. Art XVI, § 59 (a) ("The conservation and development of all of the natural resources of this State ... and the preservation and conservation of all such natural resources of the State are ... public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto"); Barshop v. Medina County Underground Water Conservation Dist. , 925 S.W.2d 618, 626 (Tex. 1996). The Amendment authorizes the Legislature to pass all such laws as may be necessary and appropriate to protect our most precious natural resource-water. TEX. CONST. Art. XVI, § 59 (b) ("There may be created ... such number of conservation and reclamation districts as may be determined to be essential").
The Edwards Aquifer ("the aquifer") is a unique underground system of water-bearing geologic formations in South-Central Texas. Barshop , 925 S.W.2d at 623. The aquifer is the primary source of water in the region. Edwards Aquifer Auth. v. Chem. Lime, Ltd. , 291 S.W.3d 392, 394 (Tex. 2009). Water enters the aquifer through the ground as surface water and rainfall and leaves through well withdrawals and springflow. Id. The Comal Springs and San Marcos Springs sit on the eastern edge of the aquifer. Sierra Club v. Babbitt , 995 F.2d 571, 573 (5th Cir. 1993). These springs systems are hydraulically connected to the aquifer. The volume of flow emanating from the springs is directly influenced by the water level of the aquifer, which in turn is influenced by the ratio of recharge over time to both natural discharge through springs and artificial discharge through wells. See id Without regulation, during drought conditions, withdrawals from the aquifer increase and thereby reduce flows from the springs. Shields v. Babbitt , 229 F.Supp.2d 638, 645 (W.D. Tex. 2000), vacated sub nom , Shields v. Norton , 289 F.3d 832 (5th Cir. 2002), cert. denied , 537 U.S. 1071, 123 S.Ct. 663, 154 L.Ed.2d 565 (2002). The flow from these springs is vital for the survival of various species and feeds tributaries that flow to the bay and estuaries in the Gulf Coast. Id. ; Sierra Club v. Lujan , 1993 WL 151353, at *33-35 (W.D. Tex. Feb. 1.1993). "The prospect of future droughts always lingers in the face of ever-increasing demands for water from the aquifer." Barshop , 925 S.W.2d at 626.
In 1993, in response to a federal court order to protect aquifer-dependent threatened and endangered species,[4] and with "anticipated increases in the withdrawal of water from the aquifer and the potentially devastating effects of a drought, the Legislature determined it was necessary, appropriate, and a benefit to the welfare of this state to provide for the management of the aquifer." Barshop , 925 S.W.2d at 623-24. Thus, pursuant to its authority under Article XVI, § 59 of the Texas Constitution, the Legislature passed the Edwards Aquifer Authority Act ("the EAA Act") and "a conservation and reclamation district, to be known as the Edwards Aquifer Authority, [was] created in all or part of Atascosa, Bexar, Caldwell, Comal, Guadalupe, Hays, Medina and Uvalde counties." The EAA Act, §§ 1.01-1.02 (docket no. 119, exh. A).
B. Purpose of the EAA
As the Supreme Court noted in Ball , "[a] key part of the Salyer decision was that the voting scheme for a public entity like a water district may constitutionally reflect the narrow primary purpose for which the district is created." 451 U.S. at 369, 101 S.Ct. 1811. In Salyer , the *745 "primary purpose, indeed the reason for [the district's] existence, [was] to provide for the acquisition, storage, and distribution of water...". Salyer , 410 U.S. at 728, 93 S.Ct. 1224. Likewise, in Ball , the primary legislative purpose of the district was "to store, conserve, and deliver water for use by [d]istrict landowners, and the sole legislative reason for making water projects public entities was to enable them to raise revenue through interest-free bonds...". Ball , 451 U.S. at 369, 101 S.Ct. 1811. In this case, the primary purpose of the EAA is the management, protection, preservation, and conservation of the Edwards Aquifer, a unique and distinctive natural resource. More specifically, § 1.01 of the Act provides:
The legislature finds that the Edwards Aquifer is a unique and complex hydrological system, with diverse economic and social interests dependent on the aquifer for water supply. In keeping with that finding, the Edwards Aquifer is declared to be a distinctive natural resource in this state, a unique aquifer, and not an underground stream. To sustain these diverse interests and that natural resource, a special regional management district is required for the effective control of the resource to protect terrestrial and aquatic life, domestic and municipal water supplies, the operation of existing industries, and the economic development of the state. Use of water in the district for beneficial purposes requires that all reasonable measures be taken to be conservative in water use.
Docket no. 119, exh. A (emphasis added). This Court previously described the purpose of the EAA as follows:
[T]he Texas Legislature created the district in order to provide for the conservation, preservation, protection, and recharge of the underground water-bearing formations within the District and the prevention of waste and pollution of this underground water. The District also was created to ensure equitable allocation of underground water among human uses and users within the District, and to protect aquifer-supported habitats such as San Marcos Springs in Hays County and Comal Springs in Comal County.
Docket no. 119, exh. T; Williams v. Edwards Underground Water District, et. al. , No. SA-92-CA-144, docket no. 2, exh. A (W.D. Tex. May 5, 1994), vacated on other grounds , docket no. 3 (Feb. 7, 2012).[5] The original legislative purpose of the EAA has not changed.
C. Powers and authority:
Special districts created pursuant to Article XVI, § 59 have only such powers and authorities as "may be conferred by law." TEX. CONST. Art. XVI, § 59 (b). Thus, the EAA has only those powers expressly granted to it by the Texas Legislature. Those powers are generally set forth in § 1.08(a) of the Act, which states "[t]he authority has all of the powers, rights, and privileges necessary to manage, conserve, preserve, and protect the aquifer and to increase the recharge of, and prevent the waste or pollution of water in, the aquifer. The authority has all of the rights, powers, privileges, authority, functions, and duties provided by the general law of this state, including Chapters 50, 51, and 52, Water Code, applicable to an authority created under Article XVI, Section 59, of the Texas Constitution." Docket no. 119, exh. A. "The authority's powers regarding underground water apply only to underground water within or withdrawn from the aquifer."
*746 § 1.08(b). Plaintiffs describe these powers as broad and far-reaching, but the EAA's power and authority is limited to carrying out its narrowly defined statutory purpose to manage, protect, preserve, and conserve the water in the aquifer.
Like the special purpose districts in Salyer and Ball , the EAA has the power to adopt and implement rules to exercise its authority, § 1.11(a), and the power to enforce those rules, § 1.11(c).[6] The EAA may issue or administer grants, loans, or other financial assistance to water users for water conservation and water reuse; receive grants, awards, and loans for use in carrying out its powers and duties; enter into contracts; sue and be sued in its own name; hire an executive director and delegate the power to hire employees to that executive director; own real and personal property; close abandoned, wasteful, or dangerous wells; hold permits under state or federal law pertaining to the Endangered Species Act ; enforce Chapter 32 of the Water Code and rules adopted thereunder within the EAA boundaries; own and/or operate recharge facilities as long as it does not include a facility to re-circulate water at Comal or San Marcos Springs; and the power of eminent domain (which does not include the acquisition of rights to underground water by the power of eminent domain). §§ 1.11(d), 1.24. The EAA has the duty to manage withdrawals of water from the aquifer and monitor withdrawal points, such as wells, through a permit process. §§ 1.14-1.23. The EAA is tasked with developing, implementing, and reviewing a "comprehensive water management plan that includes conservation, future supply, and demand management plans." § 1.25. The EAA must also have a "critical period management plan" that addresses discretionary and nondiscretionary use; reductions in discretionary use; and if further reductions become necessary, reductions of nondiscretionary use by permitted or contractual users. § 1.26. Additionally, the EAA must develop a "recovery implementation program" that includes a habitat conservation plan, § 1.26 A, and conduct research that focuses on water quality, augmentation of springflow, enhancement of recharge and yield, management of water resources, water conservation, water use/reuse, drought management, and alternative supplies of water for users, § 1.27. The EAA "shall assess" equitable aquifer management fees based on aquifer use to finance its administrative expenses and programs, § 1.29. And the EAA may suspend permits and/or assess penalties when aquifer water is impermissibly withdrawn, wasted, or polluted. § 1.35-1.40.
The EAA cannot impose ad valorem property taxes or sales taxes. See Ball , 451 U.S. at 366, 101 S.Ct. 1811. Nor does EAA provide general public services such as the operation of schools, housing, transportation, public utilities, road building and maintenance, public sanitation, health, welfare services or anything else of the type ordinarily financed by a municipal body. See Ball , 451 U.S. at 366, 101 S.Ct. 1811 ; see also *747 Salyer , 410 U.S. at 729, 93 S.Ct. 1224 ; accord Kessler v. Grand Cent. Dist. Mgmt. Ass'n Inc. , 158 F.3d 92, 104 (2nd Cir. 1998) ("GCDMA cannot be said to exercise the core powers of sovereignty typical of a general purpose governmental body"); cf. Avery , 390 U.S. at 484, 88 S.Ct. 1114 ; cf. Hadley , 397 U.S. at 53-54, 90 S.Ct. 791.
Plaintiffs contend the EAA is more akin to a general purpose governmental body than a special purpose district because it "controls ... how everyone uses [a]quifer water." Docket no. 168, pp. 16-19. But the EAA asserts control through permit conditions only insofar as needed to fulfill its legislative mandate to conserve water from the aquifer. See EAA Act § 1.14 (authorizations to withdraw water from the aquifer shall be limited to "achieve water conservation" and "maximize the beneficial use of water available for withdrawal from the aquifer"); § 1.15 (each permit must specify the maximum rate and total volume of water that the water user may withdraw); § 1.26 (critical period management plan must distinguish between discretionary use and nondiscretionary use; require reductions of all discretionary use to the maximum extent feasible; require reduction of nondiscretionary use by permitted or contractual users and, to the extent further reductions are necessary, require reduction of use in specified order). Plaintiffs also make the broad assertion that the EAA has the "power to control how property owners can use the surface of their land." Docket no. 168, p. 20. Again, however, the EAA imposes limited restrictions only insofar as necessary to carry out its legislative mandate to protect the aquifer from pollution. See EAA Act, §§ 1.08(a) (authority to "protect the aquifer" and "prevent the waste or pollution of water" in the aquifer); 1.08(c) ("to prevent pollution and enforce water quality standards included within the authority's boundaries and within a buffer zone that includes all of the area less than five miles outside of those counties, [the EAA] shall apply pollution control regulations equally and uniformly throughout the area within the counties and the buffer zone"); and 1.081 ("[t]o protect the water quality of the aquifer, [the EAA] shall adopt rules regarding the control of fires in the aquifer's recharge zone"). The rules implemented under this authority include restrictions meant to keep sources of pollution such as sewage, liquid waste, livestock or poultry yards, cemeteries, pesticide facilities, chemical storage, standing water, debris, and coal tar-based pavement away from aquifer wells and prevent spills that release into the environment within the recharge zone of the aquifer. Docket no. 119, exh. E, EAA rules. As Plaintiffs concede, the aquifer is "highly vulnerable to contamination" (docket no. 168, p. 20) and the EAA cannot carry out its duty to protect the aquifer without implementing specific preventive measures. But these protective measures have a special purpose and their enforcement does not equate to a general purpose governmental function. Plaintiffs further allege that the EAA performs "classic governmental functions" such as making rules, deciding which permits to issue, and determining penalties. Docket no. 168, pp. 21, 26-27. But this alone does not make the EAA a general purpose governmental entity. These functions are incidental to the EAA's primary purpose-to manage, protect, preserve, and conserve the water in the aquifer. It would have been meaningless for the Legislature to create the EAA without giving it the tools it needs to carry out its duties and responsibilities.
The EAA is tasked with the power to carry out the legislative mandate to manage, protect, preserve, and conserve the water in the aquifer, but it does not have the authority to "exercise the sort of governmental *748 powers that invoke the strict demands of Reynolds. " Ball , 451 U.S. at 366, 101 S.Ct. 1811. The Texas Legislature established the EAA to fulfill the Act's limited purpose and scope, not a broader general governmental purpose. Because the EAA has a limited purpose, the powers to fulfill that purpose are also limited in scope and effect. The EAA is clearly a special purpose district that falls within the Salyer / Ball exception to the one person, one vote requirement.
VI.
The EAA apportionment scheme has a rational basis
A. The single member district apportionment scheme:
The EAA is "governed by a board of directors composed of 15 directors elected from the single-member election districts." EAA Act § 1.09. "The elected directors serve staggered four-year terms with as near as possible to one-half of the members' terms expiring December 1 of each even-numbered year." Id. Additionally, two nonvoting directors are appointed, Id. § 1.091(a), making a total of 17 EAA directors-all of whom can participate but only 15 of whom can vote. The single-member districts used to elect the 15 voting board members are distributed among the counties as follows: seven in Bexar County; one in Comal County; one in Comal and Guadalupe Counties combined; one in Hays County; one in Hays and Caldwell Counties combined; one in Medina County; one in Medina and Atascosa Counties combined; and two in Uvalde County. Id. § 1.093(a)-(o).
Section 1.094 of the Act permits modification of the district lines as follows:
(a) After each federal decennial census, or as needed, the board may modify the district lines described in Section 1.093 of this article. During March or April of an even-numbered year, the board by order may modify the district lines described in Section 1.093 of this article to provide that the lines do not divide a county election precinct except as necessary to follow the authority's jurisdictional boundaries.
(b) Modifications under this section may not result in:
(1) the dilution of voting strength of a group covered by the federal Voting Rights Act ( 42 U.S.C. Section 1973c et seq. ) as amended;
(2) a dilution of representation of a group covered by the federal Voting Rights Act ( 42 U.S.C. Section 1973c et seq. ), as amended;
(3) discouraging participation by a group covered by the federal Voting Rights Act ( 42 U.S.C. Section 1973c et seq. ), as amended; or
(4) increasing or decreasing the number of districts in any county.
(c) A county election precinct established by a county in accordance with Chapter 42, Election Code, may not contain territory from more than one authority district
EAA Act, § 1.094.
Following the 2010 census, the EAA reconfigured the districts and the plan was approved by the governing board in 2012. Docket no. 36, p. 5; docket no. 72, p. 7. The EAA submitted the changes to the United States Department of Justice for preclearance under Section 5 of the Voting Rights Act, and preclearance was granted. Docket no. 36, p. 5; docket no. 119, exh. R. The redistricting in 2012 was primarily an effort to avoid splitting precincts, which facilitates *749 joint elections between the EAA and the counties within its jurisdiction. Docket no. 119, exh. R. Subsequent elections have proceeded under the current apportionment plan during the pendency of this lawsuit.[7]
B. Disproportionate impact and balance of interests
In Salyer , the electoral franchise was restricted to only landowners and their votes were apportioned according to the assessed valuation of the land. 410 U.S. at 724-25, 93 S.Ct. 1224. In Ball , the franchise was limited to landowners and their vote was weighted by the amount of land owned. 451 U.S. at 357, 101 S.Ct. 1811. In this case, the electoral franchise is not limited to only permit holders or landowners with wells; instead, all residents within the jurisdictional boundaries of the EAA are allowed to vote. However, the apportionment scheme for the EAA board of directors is carefully balanced to reflect the different water interests in the subregions that are disproportionately impacted by the EAA. In exercising its authority to manage the aquifer, the EAA must balance discharge and recharge, pumping and spring flow. Docket no. 119, exh. Z. The various interests, which vary by subregion, include agricultural needs, spring flow contributions, pumping demands, municipal use, industrial use, protection of threatened and endangered species, downstream protection, and recharge. Id. When it comes to municipal use, the City of San Antonio is responsible for the most discharge, but the City includes only about 0.4% of the area of the recharge zone. Id. at p. 13. Two-thirds of the recharge occurs in the Western counties, about ten percent in Bexar County, and most of the rest in Comal County. Id. When it comes to per capita use, the average person in the agricultural counties uses approximately nine to eleven times as much water as the average person in Bexar County, and the average person in the spring flow counties uses more than two times as much water as the average person in Bexar County. Docket no. 169, p. 27; docket no. 119, exh. F, SS. Comal and San Marcos Springs also provide the habitat for several threatened and endangered species. Docket no. 119, exh. Z at 28. Nearly all of the pumping for agriculture takes place in Uvalde and Medina counties, and irrigation pumping is highly seasonal and extremely variable. Id. at 39. There is a finite amount of water to meet all interests and "[a]ny one user's pumping quickly and directly affects the availability of the resource for others." Id. at 112-13. The various interests are constantly competing for this natural resource, and the decisions made by the EAA's board of directors have a disproportionate impact on voters in different counties and subregions.
The EAA Act dictates how the districts are apportioned and it would not have been passed "if it was ... a San Antonio-only bill." Docket no. 119, exh. E, R. Puente deposition at 58:1-8.[8] Nor would it have passed "if it was too far slanted in the springs interest or the agricultural interest." Id at 93:15-94:4. There was an understanding that a balance of water interests was needed so that "no one could control ... pumping permits, pumping withdrawals." Id. at 93:3-23. The Texas Legislature "felt that San Antonio controlling the Edwards Aquifer was not good for the State of Texas" and a "balanced approach to the EAA's board was the right approach." Id. at 98:25-99:13. This balanced approach, which took urban, agricultural, and spring *750 flow interests into account in terms of voting power on the board, was the primary focus of the Legislature. Id. at 123:8-20. SAWS expressed its agreement with this balanced approach when the bill was being considered in the Legislature, as reflected in SAWS legal counsel's testimony before the Senate Natural Resource Committee:
The governing body of the board would be balanced among the regional interests ... If you compare the historical record, you can see that among aquifer beneficiaries, including the spring flow, usage is divided roughly one-third, one-third, one-third, in this fashion. Approximately one-third of the usage of this resource is by irrigated agriculture. Approximately one-third of the use of this resources is by municipal and industrial customers, primarily located in Bexar County, but spread throughout the five-county region. The remaining one-third of usage constitutes usage in the eastern counties or north eastern counties, Hays and Comal, but primarily spring discharge issuing from Comal and San Marcos springs, upon which that region and downstream users rely. The Senate Bill 1320 balances the governing board three, three, and three among those interests considering the Comal and Hays County interest as representing the spring flow requirements.
Docket no. 119, exh. K, Senate Natural Resource Committee hearing transcript at 27:13-28:15. When the Texas Legislature amended the Act two years later, SAWS still agreed with the balanced interest approach. As Mr. Puente explained, "[t]here will be an amendment offered that changes that elected board to a 5/7/5 board. The western counties will get an additional member, and the eastern counties will get an additional member; or the downstream people will get an additional member. Bexar County specifically will have seven members." Docket no. 119, exh. O, House Natural Resource Committee hearing transcript at 2:16-25.
Since the EAA's inception, the number of directors has changed and the original appointment scheme changed to a single member district electoral scheme, but the delicate balance of subregional interests has never changed. As cogently stated by Intervenor-Defendant NBU, "[t]he scheme of proportional representation designed by the Legislature not only reflects the interest of the region, it was the sine qua non for the legislative enactment required to conserve and protect the water resources of the Edwards aquifer." Docket no. 137, p. 3. Plaintiffs want apportionment by population rather than apportionment by subregional water interests, but population-based representation would defeat the purpose of the EAA and destroy the careful balance of interests upon which it was formed. SAWS complains that, as the largest permit holder, it bears the highest financial impact. However, this factor does not outweigh the others, and did not sway the Supreme Court in Ball, 451 U.S. at 368, 101 S.Ct. 1811 ("neither the existence nor size" of the hydroelectric power business affected the legality of the District's voting scheme).
It is undisputed that some districts are urban and very populated while others are rural and less populated; however, the EAA is a special purpose district and its apportionment plan is not subject to the strict demands of the one person one vote principle under Reynolds. The EAA single member district apportionment plan is carefully balanced to reflect the different water interests in the subregions that are disproportionately impacted by the EAA and thus meets the more relaxed rational basis review under Salyer / Ball . The apportionment scheme is rationally related to the statutory objectives of the EAA and does not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
*751 It is therefore ORDERED that the Motion for Summary Judgment on Plaintiffs' One Person, One Vote Equal Protection Claim filed by the Edwards Aquifer Authority (docket no. 119) and joined by Intervenor-Defendants Guadalupe-Blanco River Authority, City of Uvalde, County of Uvalde, City of San Marcos, and New Braunfels Utilities (docket nos. 117, 122, 124, 129, and 137) is GRANTED. Plaintiffs' Joint Motion for Partial Summary Judgment on One Person, One Vote Equal Protection Claim (docket no. 168) is DENIED. The Equal Protection claims against the EAA, brought pursuant to 42 U.S.C. § 1983, are DISMISSED with prejudice. SAWS has no other pending claims. The LULAC plaintiffs shall file a written advisory within twenty days from the date below indicating whether they will proceed with their Section 2 claim.
SIGNED this 18 day of June, 2018.

As the Court noted, the California Legislature has the authority to create not only water storage districts, but also irrigation districts, water conservation districts, and flood control districts. Salyer , 410 U.S. at 723, 93 S.Ct. 1224.

This Court previously held, in a final consent decree entered in Williams v. Edwards Underground Water District, et. al. , No. SA-92-CA-144, that "the District was established for a special limited purpose and its functions are of the narrow, special sort discussed in Ball v. James , 451 U.S. 355, 370, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981)." See Docket no. 119, exh. T (May 5, 1994). The EAA's predecessor (EUWD) was the named defendant when the lawsuit began; the EAA became the statutory successor in 1993; and the consent decree was entered in 1994. The final consent decree was later vacated on other grounds. See Williams v. Edwards Underground Water District, et. al. , No. SA-92-CA-144, docket nos. 2, 3 (W.D. Tex. Feb. 7, 2012).

The rational basis test has been applied in other equal protection challenges to the EAA Act. See Barshop , 925 S.W.2d at 631-32 (preferential allocation of water to existing users was rationally related to the goal of protecting the aquifer by controlling increased demand).

Sierra Club v. Lujan , 1993 WL 151353, at *33-35.

See note 2, supra. The EAA is the statutory successor to the EUWD. The EAA was created in 1993, prior to entry of the 1994 consent decree.

See docket no. 119, Exh. E, EAA rules, effective December 2013. These rules implement the Act and other applicable law and provide a framework for carrying out the legislative mandate to manage, protect, preserve, and conserve the water in the aquifer. The rules address, inter alia , permit applications, administrative fees, groundwater withdrawals, exempt wells, production wells, exportation prohibition, waste prevention, pollution prevention, recharge/storage/recovery projects, meters and reporting, water quality, well construction/operation/maintenance, well closures, spill reporting, registration and storage of regulated substances, storage tanks, water management, groundwater conservation and reuse, conservation grants, and penalties.

Although Plaintiffs seek permanent injunctive relief, they did not seek to enjoin any elections during the pendency of this lawsuit.

Robert Puente, former state representative and current president and CEO of SAWS, was the original sponsor of the bill.